UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

MAR 2 9 2012

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

UNITED STATES OF AMERICA,               )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )
                                        )
DARAIN ATKINSON and                     )  No.
CORY ATKINSON,                          )  4:12CR00122 JAR
                                        )
          Defendants.                   )

**INDICTMENT**

**COUNT ONE**

The Grand Jury Charges:

1.      At all times relevant, Darain Atkinson and Cory Atkinson, defendants herein,

lived in the Eastern District of Missouri.

2.      At all times relevant, Darain Atkinson and Cory Atkinson, who are brothers,

jointly owned and operated a business known as National Auto Warranty Services, Inc.

("NAWS"). NAWS routinely conducted business using the fictitious name of Dealer Services.

NAWS was structured as a privately held company and each brother owned 50% of the business.

NAWS had its principal place of business in St. Charles County, within the Eastern District of

Missouri. In or around January 2009, NAWS changed its name to US Fidelis, Inc. ("USF").

Darain Atkinson and Cory Atkinson also operated related businesses using some form of the

name US Fidelis. Unless otherwise noted, National Auto Warranty Services, Inc. (NAWS),

Dealer Services, and US Fidelis, Inc., will be referred to herein as NAWS or NAWS/USF.

3.      At all times relevant, Darain Atkinson and Cory Atkinson also owned a direct

mail business, which was known as DS Direct.

4.     At all times relevant, Darain Atkinson was president of NAWS and one of its two directors.  Cory Atkinson was vice president of NAWS and the other director.  Darain Atkinson and Cory Atkinson dominated and controlled the business decisions of NAWS.

5.     At all times relevant, NAWS primary business was marketing and selling vehicle service contracts ("VSCs") throughout the United States.  Typically, NAWS acted as a broker/seller of VSCs on behalf of other VSC administrators.  In some cases, NAWS sold VSCs on behalf of and in connection with one of its affiliated businesses, namely US Fidelis Administration Services.

6.     At all times relevant, NAWS used a variety of techniques to market and sell VSCs, including direct mail to consumers, media advertisements, and unsolicited telephone calls.

7.     At all times relevant, a VSC was not a warranty or an extended warranty.  NAWS had no affiliation with an automobile manufacturer and no ability to provide an automobile manufacturer's factory warranty and no ability to alter or extend a factory warranty.

8.     At all times relevant, a VSC covered specified types of vehicle repair costs.  The VSC administrators were responsible for paying covered claims under a VSC.  Typically, a VSC administrator's obligation to perform under the VSC was insured, including by a reinsurance group or a risk retention group.

9.     At all times relevant, the cost and availability of a VSC depended on a number of factors, including the type, age, and mileage of the vehicle in question, as well as the term of the coverage.  NAWS made a profit and attempted to make a profit by marking up the price of the VSC, which was often more than $1,000.  The total purchaser cost for a VSC was often greater than $2,000.

10. At all times relevant, most VSC purchasers financed the cost of the VSC, although some paid in full at the outset. NAWS had contracts with Mepco Finance Corporation ("Mepco"), a Michigan corporation with offices in Chicago, Illinois. At times, Mepco was known as Mepco Insurance Premium Financing, Inc. A substantial number of VSCs marketed and sold by NAWS were financed by Mepco.

11. At all times relevant, a typical VSC sale involved at least four parties: NAWS as the seller, a VSC administrator, Mepco, and a VSC customer/purchaser. NAWS typically received the largest percentage of the total sales price of a VSC – its profit, which could be approximately 60%. This was sometimes referred to as "dealer profit." The VSC administrator received the next largest percentage – about 30% – which was sometimes referred to as "dealer cost." Mepco received approximately 10%.

12. At all times relevant, when a VSC purchaser financed its purchase, NAWS typically received its full dealer profit up front from Mepco, after the customer made an initial down payment and the first installment payment. The VSC administrator was also paid its share by Mepco.

13. At all times relevant, VSC purchasers had a right of cancellation, and VSC cancellations presented persistent issues for NAWS. VSCs were typically cancelled in one of two ways – voluntarily and involuntarily. A voluntary cancellation typically occurred when a purchaser notified NAWS and/or the administrator that the purchaser wished to cancel the VSC. An "involuntary cancellation" occurred if a purchaser stopped making payments.

14. At all times relevant, when a VSC purchaser cancelled, NAWS was required to refund some or all of its dealer profit to Mepco – the "unearned" profit. When a VSC purchaser voluntarily cancelled, that purchaser was often entitled to a refund from NAWS for some or all

3

of the payments made for the VSC. The amount of a refund that a VSC purchaser was entitled to receive typically depended upon how much had been paid to date, any claims made under the VSC, the length of time since the VSC had been purchased, and the number of miles driven since the VSC had been purchased.

15.    At all times relevant, although the cancellation rate fluctuated, the percentage of VSCs sold by NAWS that eventually cancelled was substantial, sometimes in excess of 60 percent. The impact of cancellations on NAWS financial situation, including cash flow, was significant.

16.    At all times relevant, Darain Atkinson and Cory Atkinson requested and were regularly provided with financial information which included cash flow and cash availability information for NAWS.

17.    At all times relevant, Darain Atkinson and Cory Atkinson routinely used NAWS cash and funds as a means of funding their personal lifestyles, including paying for the costs of building and buying multi-million dollar homes in St. Charles County, Missouri, Lake Tahoe, and the Cayman Islands. Darain Atkinson and Cory Atkinson also used NAWS funds to pay for luxury vehicles, boats, and the expenses of relatives. These funds taken by Darain Atkinson and Cory Atkinson were typically treated by NAWS's internal financial personnel as distributions to the shareholders.

18.    Between 2006 and 2008, Darain Atkinson and Cory Atkinson received distributions totaling more than $71 million from NAWS, a substantial percentage of which funds were used to pay for their personal expenses. Records from NAWS indicate that, in 2006, Darain Atkinson received distributions in excess of $13 million and Cory Atkinson received distributions in excess of $14 million. In 2007, Darain Atkinson and Cory Atkinson each

4

received distributions in excess of $8 million.  In 2008, Darain Atkinson and Cory Atkinson each received distributions in excess of $13 million.  For the tax years 2006 and 2007, Darain Atkinson and Cory Atkinson failed to report the taxable distributions as income.

19.     At all times relevant, NAWS was an S-Corporation for federal income tax purposes.  As an S-Corporation, the income and losses of NAWS passed through to the personal income tax returns of the shareholders, Darain Atkinson and Cory Atkinson.

20.     In 2005, NAWS maintained its books and records, and filed its tax returns, using cash basis accounting.  Cash basis accounting recognizes revenues and expenses at the time funds are actually received and paid out.  Thus, on a cash basis, NAWS recognized revenue when it received its dealer profit from Mepco.  In contrast to cash basis accounting, under accrual basis accounting, income is recognized at the time revenue is actually earned (but not necessarily received), and expenses are recognized when liabilities are incurred (but not necessarily paid).

21.     For tax year 2005, Darain Atkinson reported a federal taxable income of $5,289,057, and paid a federal income tax of $1,825,229.  For tax year 2005, Cory Atkinson reported a federal taxable income of $5,273,525, and paid a federal income tax of $1,819,796.

22.     Beginning in or around 2006, Darain Atkinson and Cory Atkinson explored ways of deferring recognition of revenue for NAWS for federal income tax purposes.  In or around 2006, NAWS began a practice of maintaining two different accounting methods.  Internally, NAWS used a "modified cash basis" form of accounting.  Under this method, NAWS recognized revenue – its dealer profit – as it was received from Mepco, but did not include a corresponding liability or allowance for predictable cancellations.  The modified cash basis distorted the true financial situation of NAWS.  In 2006, for tax purposes, NAWS began using the accrual basis of

5

accounting. As a result of the accounting changes of 2006, NAWS revenue was inflated for business purposes on its internal books, but diminished for tax purposes on its federal tax returns.

23.     When NAWS switched accounting methods for tax purposes, Darain Atkinson and Cory Atkinson were advised that NAWS was required to file an IRS Form 3115, notifying the Internal Revenue Service of the change in accounting. Similarly, NAWS was advised to modify its contractual arrangement with Mepco, the company that financed the majority of the VSCs sold by NAWS, in order to reflect the accounting change. The IRS Form 3115 was not filed with the IRS, and the contractual arrangements with Mepco were not modified, before NAWS switched accounting methods and returns were filed for the Tax Year 2006. Despite the accounting change, NAWS filed the 2006, 2007, and 2008 corporate tax returns stating the accounting method as "cash," not accrual, on the original returns submitted to the Internal Revenue Service.

24.     At times, NAWS maintained income tax escrow accounts to hold funds to pay the personal tax liabilities of Darain Atkinson and Cory Atkinson.

25.     At times, the distributions taken from NAWS by Darain Atkinson and Cory Atkinson resulted in cash shortfalls at NAWS. In some instances, substantial funds held in the income tax escrow account were used to pay personal expenses of Darain Atkinson and Cory Atkinson.

26.     At all times relevant, a major concern at NAWS was the impact of cancellations on NAWS's financial condition. NAWS did not maintain a sufficient reserve account to pay the expenses associated with cancellations. As a result of Darain Atkinson's and Cory Atkinson's personal spending of NAWS funds, and a lack of sufficient reserve funds, NAWS relied extensively on new sales to pay the costs associated with VSC cancellations.

27.     At all times relevant, in order to generate VSC sales to keep NAWS afloat and maintain their personal spending habits, at the direction of, and with the knowledge of, Darain Atkinson and Cory Atkinson, NAWS employed a variety of telemarketing sales techniques. These techniques included mailing millions of confusing and misleading mailers which were designed to generate in-bound calls to a NAWS sales center in the Eastern District of Missouri. At times, NAWS also employed the use of unsolicited, pre-recorded sales calls using a variety of services, including a Florida business referred to herein as "VT" and another Florida business referred to herein as "VS." The pre-recorded sales calls were used to direct potential customers to a NAWS telemarketing center in the Eastern District of Missouri.

28.     On or about March 1, 2010, NAWS/USF filed for bankruptcy protection in the Eastern District of Missouri.

29.     Between in or around at least 2006, and continuing until in or around 2009, the exact dates being unknown, in the Eastern District of Missouri and elsewhere,

**DARAIN ATKINSON, and**
**CORY ATKINSON,**

the defendants herein, did knowingly combine, conspire, confederate and agree with each other to commit certain offenses against the United States, that is:

A.     To devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, and in attempting to do so, did use and cause the use of the United States mails, in violation of Title 18, United States Code, Section 1341; and

7

B.      To devise a scheme and artifice to defraud and to obtain money and property by

means of material false and fraudulent pretenses, representations, and promises, and for

the purpose of executing the scheme and artifice to defraud, and in attempted to do so, did

transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and

sounds, in violation of Title 18, United States Code, Section 1343.

30.     In furtherance of the conspiracy, and to accomplish the objects of the conspiracy,

the defendants committed, and caused to be committed, the following overt acts, among others,

within the Eastern District of Missouri and elsewhere:

A.      As part of the conspiracy, Darain Atkinson and Cory Atkinson employed and

caused NAWS employees and others associated with NAWS to employ materially false,

fraudulent, deceptive, and misleading sales and marketing practices.  These practices

were intended to generate sales calls into a NAWS telemarketing and sales facility in the

Eastern District of Missouri.

B.      As part of the conspiracy, Darain Atkinson directed NAWS personnel to

fraudulently withhold substantial portions of refunds due to customers who cancelled

their VSC and were owed a full or prorated refund.  At times, NAWS routinely

fraudulently withheld approximately 40% of the total refund due to customers who

legitimately cancelled and attempted to cancel their VSC.  Often, only customers who

complained or threatened action were provided a full refund to which they were entitled.

C.      As part of the conspiracy, with the knowledge and under the direction of Darain

Atkinson, NAWS personnel routinely made the cancellation and refund process difficult

8

to discourage VSC purchasers from being able to obtain refunds to which they were entitled.

D.      As part of the conspiracy, on or about April 9, 2008, in the Eastern District of Missouri and elsewhere, a VSC purchaser referred to herein as "W.W." notified NAWS of his intention to cancel his VSC.

E.      As part of the conspiracy, although W.W. was entitled to a refund of approximately $423.00, pursuant to the fraudulent refund policy of Darain Atkinson, NAWS withheld approximately $169.25 of the refund.  Only after W.W. engaged the assistance of a consumer protection agency, did he receive the full amount of the refund to which he was entitled.

F.      As part of the conspiracy, Darain Atkinson and Cory Atkinson attempted to fraudulently obtain their dealer profit from Mepco when it was not due to NAWS.  At the time Darain Atkinson and Cory Atkinson knew and had reason to know that a substantial percentage of VSC buyers cancelled, which would adversely impact the cash flow of NAWS and the ability of Darain Atkinson and Cory Atkinson to withdraw cash from the business.

G.      During the conspiracy, on or about February 9, 2008, the Chief Financial Officer ("CFO") of NAWS notified Darain Atkinson and Cory Atkinson of a pending multi-million dollar personal tax liability for the tax year 2007 stemming from NAWS's anticipate profit, and the need to raise funds to pay taxes and avoid scrutiny of NAWS's accounting methods and its failure to file required forms with the Internal Revenue Service.

H.      As part of the conspiracy, on February 11, 2008 and February 12, 2008, Darain

Atkinson and Cory Atkinson caused a NAWS employee to use and attempt to use Cory

Atkinson's American Express credit card to make first payments for customer accounts

that were past due or cancelled which would trigger dealer profit payments from Mepco

to NAWS which would otherwise not have been paid.

In violation of Title 18, United States Code, Section 371.

### COUNT TWO

The Grand Jury further charges:

1.      The Grand Jury realleges and incorporates by reference herein paragraphs 1

through 27 of Count One.

2.      On or about September 9, 2007, Darain Atkinson filed a joint federal income tax

return with the Internal Revenue Service for the tax year 2006.

3.      For the tax year 2006, Darain Atkinson received approximately $13,648,647 in

distributions from NAWS.  Despite receiving millions of dollars from NAWS, Darain Atkinson

reported a negative adjusted gross income of approximately $6,612,925, and no taxable income,

on his 2006 personal tax return.

4.      On or about September 9, 2007, in the Eastern District of Missouri and elsewhere,

defendant,

### DARAIN ATKINSON,

a resident of St. Charles County, Missouri, did willfully make and subscribe a Joint Federal

Income Tax Return, Form 1040, for the tax year 2006, which was verified by a written

declaration that it was made under penalties of perjury and filed with the Director, Internal

Revenue Service Center, Kansas City, Missouri, which said Joint Federal Income Tax Return,

10

Form 1040, for the tax year 2006, **DARAIN ATKINSON** did not believe to be true and correct

as to every material matter, in that said Joint Federal Income Tax Return, Form 1040, for the tax

year 2006 reported no taxable income, when in truth and in fact, **DARAIN ATKINSON**

received millions of dollars of taxable distributions from his business in 2006 which were not

stated on his return.

In violation of Title 26, United States Code, Section 7206(1).

### COUNT THREE

The Grand Jury further charges:

1.      The Grand Jury realleges and incorporates by reference herein paragraphs 1

through 27 of Count One.

2.      On or about September 19, 2007, Cory Atkinson filed a joint federal income tax

return with the Internal Revenue Service for the tax year 2006.

3.      For the tax year 2006, Cory Atkinson received approximately $14,785,276 in

distributions from NAWS.  Despite receiving millions of dollars from NAWS, Cory Atkinson

reported a negative adjusted gross income of approximately $6,602,953, and no taxable income,

on his 2006 personal tax return.

4.      On or about September 19, 2007, in the Eastern District of Missouri and

elsewhere, defendant,

### CORY ATKINSON,

a resident of St. Charles County, Missouri, did willfully make and subscribe a Joint Federal

Income Tax Return, Form 1040, for the tax year 2006, which was verified by a written

declaration that it was made under penalties of perjury and filed with the Director, Internal

Revenue Service Center, Kansas City, Missouri, which said Joint Federal Income Tax Return,

Form 1040, for the tax year 2006, **CORY ATKINSON** did not believe to be true and correct as to every material matter, in that said Joint Federal Income Tax Return, Form 1040, for the tax year 2006 reported no taxable income, when in truth and in fact, **CORY ATKINSON** received millions of dollars of taxable distributions from his business in 2006 which were not stated on his return.

In violation of Title 26, United States Code, Section 7206(1).

### COUNT FOUR

The Grand Jury further charges:

1.        The Grand Jury realleges and incorporates by reference herein paragraphs 1 through 27 of Count One.

2.        On or about October 15, 2008, Darain Atkinson filed a joint federal income tax return with the Internal Revenue Service for the tax year 2007.

3.        For the tax year 2007, Darain Atkinson received approximately $8,132,097 in distributions from NAWS. Despite receiving millions of dollars from NAWS, Darain Atkinson reported only $73,378 in taxable income on his 2007 personal tax return.

4.        On or about October 15, 2008, in the Eastern District of Missouri and elsewhere, defendant,

### DARAIN ATKINSON,

a resident of St. Charles County, Missouri, did willfully make and subscribe a Joint Federal Income Tax Return, Form 1040, for the tax year 2007, which was verified by a written declaration that it was made under penalties of perjury and filed with the Director, Internal Revenue Service Center, Kansas City, Missouri, which said Joint Federal Income Tax Return, Form 1040, for the tax year 2007, **DARAIN ATKINSON** did not believe to be true and correct

as to every material matter, in that said Joint Federal Income Tax Return, Form 1040, for the tax

year 2007 reported a taxable income of $73,378, when in truth and in fact, **DARAIN**

**ATKINSON** received millions of dollars of taxable distributions from his business in 2007

which were not stated on his return.

In violation of Title 26, United States Code, Section 7206(1).

### COUNT FIVE

The Grand Jury further charges:

1.      The Grand Jury realleges and incorporates by reference herein paragraphs 1

through 27 of Count One.

2.      On or about October 11, 2008, Cory Atkinson filed a joint federal income tax

return with the Internal Revenue Service for the tax year 2007.

3.      For the tax year 2007, Cory Atkinson received approximately $8,513,210 in

distributions from NAWS.  Despite receiving millions of dollars from NAWS, Cory Atkinson

reported a negative adjusted gross income of $82,790, and no taxable income, on his 2007

personal tax return.

4.      On or about October 11, 2008, in the Eastern District of Missouri and elsewhere,

defendant,

### CORY ATKINSON,

a resident of St. Charles County, Missouri, did willfully make and subscribe a Joint Federal

Income Tax Return, Form 1040, for the tax year 2007, which was verified by a written

declaration that it was made under penalties of perjury and filed with the Director, Internal

Revenue Service Center, Kansas City, Missouri, which said Joint Federal Income Tax Return,

Form 1040, for the tax year 2007, **CORY ATKINSON** did not believe to be true and correct as

13

to every material matter, in that said Joint Federal Income Tax Return, Form 1040, for the tax year 2007 reported no taxable income, when in truth and in fact, **CORY ATKINSON** received millions of dollars of taxable distributions from his business in 2007 which were not stated on his return.

In violation of Title 26, United States Code, Section 7206(1).

A TRUE BILL.

_____
FOREPERSON

RICHARD G. CALLAHAN
United States Attorney

_____
JOHN M. BODENHAUSEN, #49568MO
Assistant United States Attorney